Good morning, ladies and gentlemen. Our first case for argument this morning is 1,000 Friends of Wisconsin against the Wisconsin Department of Transportation. Mr. Russomano. Good morning. I'm Anthony Russomano, and I represent the Wisconsin Department of Transportation, or WSDOT, in this NEPA challenge for the National Environmental Policy Act. WSDOT asked this court to reverse I think it would be a good idea for you to use real words. WSDOT is not in a dictionary. Sure. It's a department. I can refer to them as department if that would be better. Just refer to it as the state. The state, yes. That will become important because I'm going to ask you to address some jurisdictional issues, one of which is the fact that the United States has not appealed. That's correct. What do you think the significance of that is? For purposes of jurisdiction, I don't think that poses a problem because the state is, well, it was the main creator of the documents under review, and certainly its interests are impacted by the NEPA question in this case. Well, are you familiar with Hollingsworth against Perry? Your Honor, not off the top of my head, but I might be able to speak to the principles. I know. That's part of the problem in the briefing in this case. I'm going to come back to whether there is even an appealable judgment. But so far as I can figure out, the only thing the district court did was to set aside the record of decision entered by the U.S. Department of Transportation, which has not appealed. It has not entered any relief against the Wisconsin Department of Transportation. In Hollingsworth, the district court entered an injunction against the Attorney General of California, who chose not to go to the Supreme Court or the Court of Appeals. But a group of people who claimed to be interested in the outcome nonetheless appealed, and the Supreme Court said they couldn't. That's also what happened in this case, in this court, in a case called Kendall Jackson Winery against Branson. An order is entered against a public official who chooses not to appeal, and a group of people who claim to be interested in the outcome nonetheless tries to appeal, and we said they couldn't. So that's my opening question to you. Given Hollingsworth, given Kendall Jackson, how can somebody who was not ordered to do anything by the district court appeal? Well, Your Honor, we think, at least in this case, it's different. In the context of NEPA, in this case, it was a joint effort by the state and the Federal Highway Administration to create both the record of decision and the underlying EIS, the Environmental Impact Statement. And I believe, and I could give this court one citation off the cuff. That's what the appellants in Hollingsworth said. They were the proponents of the part of the state constitution that the Ninth Circuit held was invalid, and the Supreme Court said that wasn't enough. You have to have an appeal by the person who is the subject of the court's order. And yes, Your Honor, and we believe that in all real ways, in a sense of standing, that the department, the state, certainly is one of those parties. The state was in the process of building this road. It created these documents. The state can build the road as it pleases. There is absolutely nothing in the district court's order stopping the state from doing all the building it wants. Well, it's in fact- In fact, the plaintiffs asked for an injunction, and the district court denied it. The only thing the district court has done is to set aside the record of decision of the U.S. Department of Transportation, which didn't appeal. If I may, Your Honor, the court denied the injunction as moot because the court understood that vacating- The court may have had a bad reason, but there is no injunction. And indeed, all the lack of an Environmental Impact Statement does is mean there is no federal money. So the state can build anything it wants. It just can't claim reimbursement from the federal treasury. As a practical matter, I'm not sure if that's true in this case because there's already federal money intertwined with this roadway. But I take your point, Your Honor. And if I could point the court to one case that I do have on hand. It's a Ninth Circuit case en banc called Organized Cake v. United States Department of Agriculture. It was the Ninth Circuit that got its head handed to it in Hollingsworth v. Perry. But go ahead. It is a NEPA case, and it is a situation where a state actor, the state agency, sought to intervene. So the federal defendant was a defendant there, and the state actor sought to intervene. Here it's a bit different. The state was a named defendant. It was named as a party, but it didn't appeal. I think we've got a problem. You're obviously not prepared to talk about Hollingsworth and Kendall-Jackson, but I think we are going to need to have some discussion of whether, in the absence of an appeal by the only party affected by the district court's order, anybody else can appeal. And we are probably also going to have to have some supplemental briefing on the question whether anybody could appeal from this order. The district court was asked to enter a declaratory judgment, and it said the plaintiffs were entitled to it. But I can't find it. Am I missing something? Your Honor, I'll pull out my documents here to try to provide you with that. There is a judgment which says it is ordered in a judge that the plaintiff has prevailed on its claim for declaratory relief under NEPA. But where is the declaratory judgment? If you prevail on your claim for a declaratory relief, the next thing that happens is that the district court enters a declaratory judgment. And I looked for it and couldn't find it. Your Honor, yes, the only things that that refers to are the decision and order from, let's see, April 29, 2016, and there's also an order from May 22, 2015, in which the court vacated the record of decision. Yes, is there a declaratory judgment? That is all there is. This lawsuit was commenced seeking a declaratory judgment. And the district judge wrote an opinion which said the plaintiff is entitled to one. I can't find it. Until it's entered, how is there an appealable order? I can only tell you what I believe the parties understood here in the court. It doesn't matter what the parties understood, right? If we say over and over that the judgment in a federal case must award the relief to which the prevailing party is entitled, and that means if the plaintiff is entitled to a declaratory judgment, then there has to be a declaratory judgment. I can't find it. You apparently can't find it. I'm totally perplexed that nobody went back to the district judge and said, please enter the declaratory judgment. Would your answer be that the declaratory judgment is on the last page of both the original decision and the subsequent decision, or is it not there? The declaration requested was to order the record of decision invalidated, to vacate it, and that's what the court declared. It is invalidated. So you think there's no declaratory relief other than to vacate the record of decision? Correct. That's not a declaratory judgment. Well, maybe the terminology is incorrect, Your Honor, but that was the relief requested by the plaintiffs and the relief provided by the district court. That was certainly the only relief I could find is that the March 17 record of decision is vacated. But as far as I can see, that affects the U.S. Department of Transportation. That comes back to my first question. And, sure, my answer before was that the vacating of the record of decision halts this road project as it stands. No, it doesn't. It halts federal funding of this road project. Which is how the project currently stands. Well, it's fine. Wisconsin can say if we don't get federal money, we're not going forward. But the judge has not halted the road project. The judge has halted federal funding of the road project. In effect. I think we're going to need supplemental memos from both parties on these jurisdictional questions. One is whether it is appealable because there is still some declaratory judgment left to come. And the other is whether anybody other than the U.S. Department of Transportation can appeal. And despite the curious silence of the U.S. Department of Transportation, which remains a party in this case, we are going to order the U.S. Department of Transportation to file a memo on those questions. Does anybody have any idea why, although they are a party, they have not bothered to file a brief? I certainly can't speak for them, Your Honor. I know you can't speak for them. I just wondered if you would add some discussions with them. They not only haven't appealed. They have simply ignored the appeal, even though everybody who was not an appellant is an appellee. And my answer to that, Your Honor, from the state's perspective is that the state was the prime mover in these record of decision and the environmental impact statement documents, the research, the reporting. And the state's plans, the state's vision for this road is what's at stake here for the state. It's very important to the state that this project go forward. And that's why the state's here presenting the argument to this court. It's a state project. It happened to have federal interaction, federal money involved as well. So that's why we think it makes sense for the state to be here pleading its case because the state wants this road. The state has done the work, it thinks, to satisfy it. Do you think you could have filed a lawsuit against the U.S. Department of Transportation if they had not issued this environmental impact statement in the first place? I doubt it, Your Honor. We said in Kendall-Jackson that that is the question. If the person other than the target of the injunction could have sued the target of the injunction demanding relief, then that person's failure to appeal isn't fatal. But if you concede that you could not have sued the U.S. Department of Transportation demanding an EIS or demanding a revised environmental impact statement or demanding that they appeal, then at least under our analysis in Kendall-Jackson, there's a very serious problem. Sure, Your Honor. And I can't speak definitively whether that kind of lawsuit would happen. Off the cuff, I don't know of one. And I would posit that our case where you have two entities, a state and a federal, intertwined in their actions under the National Environmental Policy Act, it's not the same thing. And you have two government actors, both of which are proper defendants, both of which are proper appellants in this case. I hope you understand my concern. I do, Your Honor. Normally we say the appellant is the one who is the target of the relief. If there's a lawsuit against A and B and A is ordered to pay damages and B is not, B can't appeal. Here the relief has been entered against the U.S. Department of Transportation  Yes, Your Honor. And the target of the relief hasn't appealed and the non-target of the relief has appealed. It's pretty fundamental. That's why you get to the Supreme Court in cases like Hollingsworth against Perry. But it might have something to do with a relationship. And it's very troubling that both sides simply ignore a major problem with appellate jurisdiction, which both sides' briefs did. Do you agree with the premise that the Wisconsin Department of Transportation was not the target of relief in the district court? I don't, Your Honor. And why is that? Because this whole case, including the action taken by the district court, is about this project that the Wisconsin Department of Transportation, the state of Wisconsin, is trying to accomplish. And as the project exists, it needs this record of decision, which was vacated, to be valid to go forward. Vacating that affects the state of Wisconsin's interest directly. It halts that project as funded currently. Why did 1,000 Friends include the Wisconsin Department of Transportation as a defendant? I assume because they thought it was a proper party, because there was the possibility of enjoining the Wisconsin Department of Transportation, but also because the Wisconsin Department of Transportation did all this work that's being reviewed, with input from the Federal Highway Administration. But it created these documents that are under review and then were approved by the Federal Highway Administration. And these efforts were intertwined together. These are both actors in this National Environmental Policy Act context. And certainly, as Judge Easterbrook has said, we'll be happy to expand on that in a supplemental briefing to explain it to the court further. Can I just ask you about the merits, if we should get to that, which is certainly in question? But let me ask you this. Is it your position that we have to give deference to an agency's decision not to follow its own cited methodology? Well, Your Honor, if I can answer that question in a couple parts, it depends on what cited methodology we're talking about. Well, we're talking about the travel data versus the traffic analysis forecast. The rule is that agencies get deference in compiling the NEPA document, the environmental statement document, and also in choosing and implementing the methodologies, and also how they explain their methodologies in the document. So all those things receive deference. And I think what Your Honor is referring to is it's on page, I think, 600 and I forget the exact page. Far along in the document under question, after all the environmental analysis and other purpose and need criteria about why this project should go forward are stated. There it says that there's a 10% compromise number issue, if I'm correct, if that's what you're referring to, Your Honor. That statement, if taken the way the plaintiffs have taken it, is not literally followed, no. But if that statement were stricken from the environmental document, it would make no difference to the big picture, to the reasons the project is going forward, for the reasons given in the environmental impact statement, the current need based on congestion right now, the current needs based on too many access points, no median. All of those problems with the road, the lack of continuity, exist right now. That 10% number doesn't impact those things. So for that reason, so our answer, I suppose, is it's ultimately irrelevant under NEPA. It's not a basis under NEPA to say you can invalidate a whole environmental impact statement if there's a mistake, basically, in the explanation of a methodology. We're not asking the court to defer to that 10%. We're explaining that that 10% ultimately doesn't matter. Well, what careful analysis of new population and household data was conducted to determine it was not important? And so I believe that question, Your Honor, gets to there were some updated population numbers that were released in 2014 that were included in the impact statement. Those numbers showed a somewhat slower growth rate in the surrounding counties. Right, and wouldn't that be relevant to the travel demand methodology? Your Honor, it's not an input into that travel demand model, and I'll try to kind of wrap it up as neatly as I can. The travel demand model uses the terms of geospatial and socioeconomic data, but I guess the English is it plots on the actual roadway where people live, where businesses are, where big box stores are, where schools are. And based on those modelings, it estimates trips on that road now and in the future. The gross population data is not one of those inputs because it doesn't tell you where people are building their houses or where the businesses are at. So there's other types of data, including from the Wisconsin Department of Administration, which is the source of that population data. Household data is used in conjunction with a lot of other information. Local planning officials tell the state where they're planning to build neighborhoods and where development's coming in and the like. So it's actually down more like in a census block level right by the road. That's the information that's used in the travel demand model. They don't use that data set at all in the travel demand model, is the answer, Your Honor. And it also still shows growth. The new numbers show that there's going to be an increase in population anyway. So it doesn't change the basic purpose and need for this project. Right now, there's congestion. In the future, there's going to be growth, so there will be congestion. Right now, there's safety problems. There's too many access points. Not going to change. There's going to be growth. So when you get back to the big picture being communicated here is the environmental impact and the reason for the decision being communicated here, and the answer, we think, is yes, with or without these numbers. You're into your rebuttal. So unless there's further questions right now, I'll reserve the rest of my time. Thank you. Thank you, Counsel. Mr. Krasinski. Good morning, Your Honors. This Court is more of an expert on federal jurisdiction and appellate jurisdiction than I am. I don't have an answer to the questions you have raised. Well, when you asked for a declaratory judgment, and so far as I can see, didn't get one, why didn't you go back to the district court and say, we have a problem here? In part, because of the court's explanation in declining to enter an injunction, because given the impact of the rods vacating, the absence of... The impact of what? Of the vacation of the record of decision. If you would use English, that would really help us. Sorry. Given the inability after the vacating of the record of decision to access federal funding, it was apparent to the court that the project was going to be put on hold. An injunction was not required. Were you asking for any declaratory relief other than the vacator of the record of decision? Essentially, yes. A declaration that the environmental impact statement was inadequate in ways that violated the requirements of NEPA, of the National Environmental Policy Act. You certainly didn't get that. Do you agree with the premise that you didn't get that, by virtue of the district court's vacating the record of decision? Isn't the necessary implication of the vacature of the record of decision a declaration that the record of decision and the EIS do not satisfy NEPA? I thought we got that based on the language in the court's two previous decisions. Yeah, that's the very problem. We have said that language in a decision does not satisfy the need for a judgment on a separate piece of paper setting out the relief to which the prevailing party is entitled. It has to be a separate document. That's what Rule 58 says. That's what we have said. And I'm going to have to look at the cases you cited and others and follow your direction in responding on the topics you've requested. Now, what's the significance in your mind of the fact that the U.S. Department of Transportation hasn't appealed? I did not view that as crucial for jurisdiction on this appeal. I viewed it simply as perhaps reflecting on the credibility of the defendant's appeal or their arguments. But I have no reason to... In other words, you didn't do any research on this question. I did not. Well, you will need to now. Do you know what the U.S. Department of Transportation is now doing? Is it revising the environmental impact statement? I do not know for certain, but I do not believe they are. Well, if they never plan to issue a new environmental impact statement, what could happen here? We will ask them what they are doing and what they think its consequence is. Since it is likely that this court at some point will address the merits, I'd like to address them. Don't count on it. But certainly you can speak to this 10%. I said we might not get there, but how does the outline general policy to use a compromise number make it mandatory that the Wisconsin Department of Transportation use a compromise number? Why isn't it just a matter of discretion for them to determine whether that policy applies here? Well, first, we assert, and relying on the cases that we cited, that failure of an agency to follow its policies is grounds for finding their action arbitrary and capricious. Secondly, the EIS, the environmental impact statement's purpose of providing information, disclosure of both the choices before the agency, the trade-offs that the agency is making, and the way in which they arrived at their decisions is violated if the agency says it's doing one thing and does something significantly different. Well, did the forecasting section chief say the travel demand model used was poorly calibrated and over-assigned traffic counts? Yes. I mean, that's cited in our brief. There are a whole range of reasons to recognize that the travel demand model has its set of weaknesses. The other model that's called TAFIS had a different set of weaknesses. When both are used, the defendant's position that when they both are used and come up with reasonably close answers for a projection of traffic gives greater reason to believe that those numbers or projections are sensible and reasonably accurate. When they say that's what we're going to do and they don't do it, and they then do not, in the environmental impact statement, explain why they didn't follow their policy, that, it seems to me, is clearly contrary to the requirements of the Act. If they had these reasons, they should have explained them, and the district court and then this court could say, yes, that's a reasonable explanation. There was none. That, it seems to me, is a clear example of something that's arbitrary and capricious. Does NEPA impose a requirement of substantive reasonableness on the agency's explanation, or does it simply require procedurally that the agency give its explanation  only to the extent that the reasoning needs to be rational? It needs to, at some basic level, make sense. It's an area of incredible deference. But the final decision as to which of the various alternatives, what a project should end up looking like, that's up to the agency, provided that the agency has provided, through the environmental impact statement, the full disclosure of the choices before the agency, the reasons for its choice, and the, basically, balancing of the tradeoffs. Well, didn't the agency do that with respect to the 10% variance issue when it got sent back to redo its homework? They submitted some reasoning to the court, but this was, as the district court found, post hoc rationalizations after the fact rationalizations. Nothing in the record itself indicates that any of the analysis, any of the thought, any of the reasoning that they presented to the district court, actually had occurred. When you talk about post hoc rationalization, are you talking about the agency's briefs in front of Judge Edelman, or are you talking about the revised technical memorandum? Both. Okay. So it's your understanding that the Chenery Doctrine applies to the revised technical memorandum? I believe it does. And even if it does not, the district court examined the rationale, the explanation that was provided, and from one perspective after another, found that the statements that were being made there simply did not bear a rational relationship to the facts. In what sense for the 10% issue? One of the reasons was that the state claimed the higher numbers produced by the travel demand model still resulted in an annual growth of traffic that was projected above the 1.5% per year state's minimum. Some of them did, some of them didn't. The state accepted all of those numbers without change, whether they were above this so-called policy minimum or below it. So suddenly the statement is sort of empty of meaning. What they said they were doing, again, they weren't doing. One of the explanations was that the travel demand model is generally preferred because it takes account of more variables. However, the record also reflected that for lower volume roads, which these were very, very, very far on the low end of the volume of the type of roads that the demand model is used, it is basically a weaker or less accurate model, and that where there's a very full history of lots of actual traffic counts and relatively low growth, the more simple computer model, the TAFIS model, is preferable and more accurate. So it was reasoning that basically was really thoroughly contradictory to the actual evidence in the record. Well, couldn't it be the case that slower projected population growth in the towns along that 19-mile stretch would result in higher population growth in the more urban cities connected by the highway, such that there was no decline in the traffic forecast for the highway? Well, the population estimates covered all of the municipalities in the corridor, covered Fond du Lac, the largest of the communities, and the one that was on the western terminus. I'd have to say no, that the population both in the state and particularly in the corridor has been growing more slowly than folks thought it was going to be growing 10 years earlier. Wisconsin is a low-growth state, to perhaps our chagrin, but no, I don't believe that's the case. It's simply there aren't going to be as many people in the corridor, in the communities adjoining the corridor. There simply aren't going to be as many people, as many jobs, as many people attending school, as many people building and living in houses in each of the succeeding years, as 10 years earlier folks had projected. That means while the locations, the types of development, where are houses going to go? They're going to go in the same places, but later and fewer numbers. It seems almost impossible to imagine a scenario where two-thirds of the expected growth isn't going to show up and yet there's going to be as much traffic as one projects with the larger population numbers. It's important to recognize that when you combine the fact that the measures by which both the four-lane expressway expansion approach and the alternative of adding passing lanes, making safety improvements, reducing access points, improving the highway without building another separate two-lane road 60 feet away. They're talking a four-lane expressway with a 60-foot wide median. But if they combine the skewed evaluation of both alternatives because of over-inflated traffic projections resulting from the population error, the refusal to update, and the failure to follow the policy that says we want our results from our two very different methods to support each other so that we reach a number that both of them support, the error is magnified. You make a very cogent critique of the state's analysis of the traffic patterns and the like. I don't know whether it's ultimately correct or not, but it's very cogent and very well thought out. But aren't you outside of the scope of NEPA at that point? Because again, NEPA is simply about laying out the facts and being transparent. It's not about the substantive reasonableness of the decisions that are made. But it's not where the environmental impact statement does not provide the reasoning, first for failing, refusing to update the traffic projections, or even to explain why the traffic projections were not updated, to provide an excuse. Well, isn't the excuse total population isn't an input into the TDM method? And again, that excuse may have substantive problems with it, but that's not NEPA. It's an excuse for saying we don't use that number, but it's not an excuse for saying this new data has to tell us and anyone and everyone that our old projections really no longer apply to the real world. They no longer apply to the world that we expect we're going to be in because it's virtually a tautology that if you don't have the people, a significant chunk of them, you're not going to have the same amount of traffic. But that's a challenge to the TDM methodology because the TDM methodology doesn't take into account total population. You don't think that makes any sense. And that's a substantive attack on the decision and not a procedural attack on the agency by way of saying you haven't explained what it is you're doing and you haven't shown that you've considered it. The agency did consider it, said yes, we acknowledge that the population growth is going to be less than we originally thought, but that's not an input into our TDM. We think, parentheses, rightly or wrongly on parentheses, that TDM is the best method and this change in the projections doesn't affect analysis under our best method. That's our decision. What is there not to understand about that? For one, that explanation was not in the EIS. Secondly, in the supplemental tech memorandum that the state and federal agencies submitted in response to the judge's first decision, the defendants claimed they had done that poll analysis and rationalization that explained or justified their failure to rerun the projections. The record itself includes not a word, not a document, not an email, not a memo, not a suggestion that any two people talked with each other on any of those topics related to explaining and justifying. We essentially have a brief and a tech memo, no indication of who prepared it, how it was prepared. It might as well have been written by the lawyers. There's just no record to support the assertions being made. Secondly, Marsh and then also the 40 CFR section 1502.22, the regulation about new information, essentially says, A, if there's new information or if there's information that would be important but you don't have. The agency needs to either go and get it, such as if they had the population data, that they go and get the household data and put it into their TDM. They have to either do those things or explain and justify why the cost is too great. There needs to be an explanation to show that the agency made a rational decision. Here we have important central new information that substantially, fundamentally undercut the projections on which the four-lane expansion was being justified, on which failure to consider the comprehensive passing lane alternative as a reasonable alternative and include a description, an explanation, identification to the public, to decision makers, to elected appointed officials, to the media, to the plaintiff, of the cost savings. We don't know how many tens of millions of dollars of state or federal, state and federal taxpayer money could have been saved. We don't know how many acres of all of the kinds of environmental resources, wetlands, woodlands, meadows, farmlands could have been saved. That choice is never laid out to the public or decision makers because they refuse to treat a passing lane alternative as a reasonable alternative and fully describe the choices they were making. Thank you. Thank you, counsel. Anything further, Mr. Russomano? Thank you. In my remaining moments, I would just like to make a few big picture points on the merits, if I may. Your Honor, I agree with some of the comments about NEPA being about disclosure. I think that the cases that we cite all support that. It's about saying, here's what we're doing and why. Other folks are free to disagree, but that's part of the debate process, but it's not a legal challenge under NEPA, the disagreement. And just to be clear, the EIS here, the Environmental Impact Statement, disclosed the method used, disclosed the travel demand model used for forecasts, disclosed the figures reached. It says what that model does. It uses road networks, land use demographics. It says why it's preferred. It allows you to look at different alternatives, changing the road capacity and seeing what happens, and it allows you to spatially locate where people are going to be going. That is plainly a rational explanation for using it. That's all you would ask under NEPA, and nothing else should be asked that these details are going into. I think that might be interesting, but these substantive questions aren't part of NEPA. And just the other related point is that nothing that the plaintiff has raised changed the environmental vantage point of this. This project that the expansion proposed, the wetland delineations, the air and water impacts are all described. No one's challenging these core environmental analyses, and that's the core question under NEPA is the environmental impact. That was disclosed. The reasons for the project were disclosed. Those reasons remain, regardless of these topics that are coming up under about forecasting, that the road makes sense right now, and it is rational. People can disagree, but the state has done what it needs to do to move forward with this project as a matter of federal law. So we would ask this court to reach the merits and reverse. Can I ask one question, bringing you back to the jurisdictional issue? Yes, Your Honor, of course. Let's say that the fact that the federal government, the federal agency did not appeal, has significance, and the significance is that the federal government cannot provide funding to the state road project. Under those circumstances, would the deprivation of federal funds to the state still give the state a stake, a sufficient stake in the outcome of the case in order to support its ability to appeal? If I understand your question, Your Honor, you're saying that the funds would be removed to the federal agency? Let's assume that the fact that the federal agency did not appeal means that the federal government can no longer provide money for the project. So the state is in a situation where it has lost money that it was expecting. Right, Your Honor. Does the loss of those millions of dollars provide the state with a sufficient stake in this litigation in order to allow it to proceed with the appeal? Yes, Your Honor, absolutely. That would provide clear standing. There's an interest for the state to be here arguing this case for the reason Your Honor just stated, that the money and also the big picture of the project as conceived could not go forward unless this court reverses as it stands. Does that answer your question? Kind of. You don't really need the state, at least as a theoretical matter, doesn't need federal funds to complete the road project. It could go into its own coffers and pay for the road project itself. I apologize, I misunderstood. But the state is now saying, yeah, well, we could do it ourselves, but we don't really want to and we were expecting all this money. And the fact that we lost all this money because the federal agency didn't appeal, does that give the state a sufficient stake? And I think your answer to that was yes. That's correct, Your Honor. And if this case didn't involve federal money to begin with, which is maybe part of that hypothetical, then I don't know we would be in federal court at all. So that may be the other part of that answer. Thank you. Thank you, Counsel. We will be directing the parties to file supplemental memos within 14 days, and the parties include the United States Department of Transportation, to file supplemental memos addressing what now seem to me at least five questions, and there may be more. One is whether the order is appealable in the absence of a declaratory judgment. Another is whether anyone other than the United States Department of Transportation can appeal. The third question is whether, just raised by Judge Feinerman, whether the failure of the United States to appeal means that it cannot fund this project, no matter what would otherwise happen, which poses the ancillary question whether Wisconsin's appeal is a request for an advisory opinion if it can't change the funding outcome. We also need to know who is the target of relief, that is, who entered the record of decision and whether the formal record of decision part of the order bears on Wisconsin. And we need to know what the current status of the environmental impact statement is in the U.S. Department of Transportation. We may memorialize this in a written order, but I think you have a sense of what needs to be discussed. And once those memos are received, the case will be taken under advisement.